LINK: 195

JS - 6

**UNITED STATES DISTRICT COURT**

**FOR THE CENTRAL DISTRICT OF CALIFORNIA**

|  |  |
|---|---|
| IN RE AIR CRASH AT MADRID, SPAIN, ON AUGUST 20, 2008. | **Case No. 2:10-ML-02135 GAF (RZx)** **MDL No. 2135** |
| . | [ALL INDIVIDUAL CASES] |
|  | MEMORANDUM & ORDER REGARDING MOTION TO DISMISS FOR FORUM NON CONVENIENS |

**I.**

**INTRODUCTION & BACKGROUND**

On August 20, 2008, a McDonnell Douglas MD-82 aircraft operated by Spanair as flight JK5022, crashed during takeoff in Madrid, Spain, killing 154 people and injuring 18 others. (Docket No. 198, Declaration of Thomas K. Dodt ("Dodt Decl.") ¶¶ 3, 6.) Evidence shows that the plane crashed after its takeoff warning system ("TOWS") did not sound to alert the pilots that the wings' slats and flaps were not configured in takeoff position. (Id. ¶¶ 11, 15.) Now, 204 plaintiffs, most of whom are citizens of Spain and none of whom are United States citizens, represent 100 passengers and estates who have brought 116 wrongful death and personal injury suits asserting negligence and strict products liability claims against McDonnell Douglas Corp., its successor, the Boeing Company, and various alleged component manufacturers. (Docket No. 199, Declaration of Douglas E. Winter ("Winter Decl.") ¶ 3.) These suits were

brought in several district courts and have been consolidated in the Central District of California by the Judicial Panel on Multidistrict Litigation.  (Docket No. 1.)

Defendants, who have stipulated to submit to the jurisdiction of the Spanish courts over these cases, note the strong interest of Spain in the outcome of this litigation given that the aircraft operator, pilots, and most victims are Spanish citizens and that the accident occurred at a Spanish airport on Spanish soil.  They now move to dismiss this case under the doctrine of <u>forum non conveniens</u>.  (Docket No. 195.)  Plaintiffs oppose and assert that this product liability action, which is brought against United States defendants who are allegedly responsible for defects in the aircraft and the resulting deaths and injuries, should be heard in United States courts.

Having fully considered the parties voluminous briefing and their arguments at the hearing on this motion, the Court concludes that Defendants' motion is meritorious. Accordingly, for the reasons discussed in detail below, the Court **GRANTS** the motion and dismisses the pending lawsuits.

## II.

## FACTS

**A.  THE ACCIDENT**

On August 20, 2008, a McDonnell Douglas MD-82 aircraft operated by Spanair as Flight JK5022, crashed on takeoff at Barajas Airport in Madrid, Spain.  (Dodt Decl. ¶ 3.)  The flight was bound for Las Palmas de Gran Canaria, Spain.  (<u>Id.</u>)  Of the 172 people on board, only 18 survived.  (<u>Id.</u> ¶ 6.)  The victims were predominantly Spanish. The Plaintiffs in these suits represent 100 passengers, of whom 92 are Spanish, three German, one Brazilian, one Gambian, one Indonesian, one Swedish, and one Turkish. (Winter Decl. ¶ 4.)  There were no American citizens on the flight.

It is undisputed that the plane crashed because leading-edge slats and trailing-edge flaps that pilots must extend at takeoff were retracted.  (Dodt Decl. ¶ 14; Opp. at 2.) The dispute is over who or what is responsible for the slats' and flaps' improper configuration.

2

The Spanish Civil Aviation Accident and Incident Investigation Commission ("CIAIAC" or "the Commission") initiated an investigation and invited the U.S. National Transportation Safety Board ("NTSB") and Federal Aviation Administration ("FAA") to participate.  (Dodt Decl. ¶ 4.)  The Commission issued an interim report on the causes of the accident in August of 2009.  (Docket No. 300, Appendix, Ex. C.)  The interim report explained that, after the plane left the gate, the Ram Air Temperature Prove ("RAT"), a piece of equipment designed to be heated during flight to avoid ice accumulation in the instrument, reflected an abnormally high temperature.  (Id. at 100, 110.)  The plane returned to the gate where maintenance personnel disabled the relay (the R2-5) that was routing power to the RAT.  (Id.)  According to plaintiffs, that same relay routes power to the "Takeoff Warning System" (TOWS).  This system is part of the plane's "Central Aural Warning System" (CAWS), which provides various audible warnings to the crew when certain potentially unsafe conditions arise or when components are improperly configured.  (Id. at 106.)  The TOWS provides warnings, in the form of an alternating sequence of tones and a synthetic voice, when the slats and flaps are not configured for takeoff.  (Id. at 106–07.)

In short, according to plaintiffs, when the relay was disabled, TOWS was cut off from its power supply and was rendered inoperable during the takeoff of Flight JK5022.  When the pilots began to accelerate that aircraft down the runway, they did not receive the aural warning that the flaps and slats were not properly deployed.  (Id.)

The interim report concluded that, in addition to the TOWS failure, other systems failed, allowing the plane to attempt to take off without the proper slat and flap configuration: compliance with the airplane configuration checklist and the checklist to confirm and verify the airplane's actual configuration.  (Docket No. 300, Appendix, Ex. C at 138.)  Spanair's normal procedures require the slats and flaps to be checked after the engines are started, during taxi, and when takeoff is imminent.  (Id. at 128–29.)  The recording from the cockpit voice recorder shows that the pilots did not perform the engine-start check and that the pilot did not respond to the co-pilot's check during taxi.

(Id. at 118.)  Although the pilots voiced the final "takeoff imminent" check, the Commission concluded that they did not actually check the cockpit indicators to confirm the slats' and flaps' positions.  (Id. at 137.)  Defendants highlight that other things also would have indicated that the slats and flaps were not appropriately configured: the position of the cockpit lever controlling the flaps and slats, an illuminated cockpit display showing the slats' and flaps' positions, and indicators of an imminent stall. (Dodt Decl. ¶ 12.)

**B.  THE ACCIDENT AIRCRAFT**

MD-82s were designed, tested, and certified by MDC in Long Beach, California, during the late 1970's and early 1980's.  (Dodt Decl. ¶ 8.)  The FAA certified the MD-82 aircraft type on July 29, 1981.  (Id. ¶ 8.)  MDC sold more than 569 MD-82 airplanes to airlines around the world before ceasing production in 1997.  (Id.) According to Plaintiffs, U.S. operators bought 361 of these.  (Opp. at 22.)

The accident aircraft was built in Long Beach in 1993 and delivered to Korean Airlines that year.  Spanair, an airline incorporated and having its principal place of business in Spain, began operating the aircraft in 1998 under Spanish registration.  (Dodt Decl. ¶¶ 7, 9.)

Leach International Corp. designed, manufactured, assembled, tested, and certified the R2-5 relay for the accident aircraft.  (Winter Decl. ¶ 7.)  The other Defendants are alleged to have manufactured component parts, but deny any knowledge that any of their products were used on the accident aircraft.  (Id. ¶¶ 8–11.)

**C.  CRIMINAL INVESTIGATION**

Madrid's "Examining Court 11" is currently conducting a criminal investigation of the accident.  (Docket No. 197, Declaration of Prof. Pablo Salvador-Coderch ("Salvador Decl.") ¶ 17.)  In October 2008, the court charged two Spanair mechanics and the head of Spanair's maintenance department with 154 counts of manslaughter and 18 counts of negligent injury, but shortly thereafter dismissed the charges against one of the

mechanics.  (Id.)  Those proceedings are still in the investigative phase.  (Deposition of Prof. Pablo Salvador-Coderch ("Salvador Depo.") at 124:4–125:4.)

In Spain, criminal proceedings resolve civil claims for damages that proximately resulted from a defendant's criminal offense.  (Salvador Decl. ¶ 18.)  Employers have respondeat superior liability for these damages.  (Id.)  Victims or their representatives or estates, however, can waive their right to compensation through the criminal proceedings and pursue a separate civil action against those persons and their employers.  (Id. ¶ 20.)

**D.  ALLEGEDLY SIMILAR PRIOR CRASH**

Plaintiffs contend that the Spanair crash at issue in this case is strikingly similar to a crash of a McDonnell Douglas MD-82 on takeoff from Detroit Metropolitan Airport in 1987.  (Mem. at 1.)  According to Plaintiffs, the NTSB concluded that the TOWS system in that plane did not receive electrical power and thus failed to warn the crew that the plane was not properly configured for takeoff.  (Id.)  Plaintiffs further report that the NTSB made six recommendations, including a design modification that would illuminate a "fail" light in the event of a circuit power loss, but Defendants did not adopt that recommendation.  (Id. at 1–2.)  Plaintiffs contend that TOWS failures now account for 49 accidents.  (Id. at 7.)  On the basis of these allegations, Plaintiffs contend that "[t]his case is about a design defect that remains uncorrected despite Defendants' knowledge of it for over 20 years."  (Id. at 2.)

Defendants dispute Plaintiffs' description of the Detroit accident's cause and the recommendations following its investigation.  (Reply at 1.)

**E.  DEFENDANTS' STIPULATION**

As a condition for a forum non conveniens dismissal, Defendants have agreed to:

(1) submit to jurisdiction before the appropriate Court of First Instance in Spain;

(2) toll any applicable Spanish statute of limitations for 120 days after dismissal by this Court;

(3) make available in Spain all evidence and witnesses located in the U.S. within their possession, custody, or control that the Spanish court deems relevant; and

(4) satisfy any final, post-appeal judgment awarded against them in Spain. (Winter Decl. ¶ 2.)

### III.

### ANALYSIS

**A.  LEGAL STANDARD**

The doctrine of forum non conveniens authorizes a district court to dismiss an action even though the court has jurisdiction.  Cariajano v. Occidental Petroleum Corp., 626 F.3d 1137, 1144 (9th Cir. 2010).  Circuit law teaches that, because dismissal is a drastic step, "forum non conveniens [is] 'an exceptional tool to be employed sparingly.'" Id. (quoting Dole Food Co. v. Watts, 303 F.3d 1104, 1118 (9th Cir. 2002)).

A party moving to dismiss based on forum non conveniens grounds "bears the burden of demonstrating an adequate alternative forum, and that the balance of private and public interest factors favors dismissal."  Id. at 1145.  Ordinarily, there is "a strong presumption in favor of the plaintiff's choice of forum," Piper Aircraft Co. v. Reyno, 454 U.S. 235, 255 (1981), and the doctrine does not require plaintiffs to choose the most convenient forum, Cariajano, 626 F.3d at 1144.  Where plaintiffs are foreign, however, their "choice deserves less deference."  Piper Aircraft, 454 U.S. at 256.

**B.  APPLICATION**

**1.  ADEQUATE ALTERNATIVE FORUM**

In general, a defendant can prove the existence of an available "alternative forum" by showing that it is "amenable to process" in another jurisdiction.  Id. at 255 n.22.  Where, however, "the remedy offered by the other forum is clearly unsatisfactory," such as where the forum does not permit litigation of the subject matter of the dispute, then "the other forum may not be an adequate alternative."  Id.  The possibility of an unfavorable change in law, without more, does not render a forum

inadequate.  Id. at 238.  It is enough that the forum provide a plaintiff with a "sufficient remedy for his wrong."  Dole Food Co., 303 F.3d at 1118.

Defendants have agreed, as a condition of dismissal, to "submit to jurisdiction before the appropriate Court of First Instance in Spain."  (Winter Decl. ¶ 2.)  Spanish courts recognize such consent to jurisdiction.  (Salvador Decl. ¶ 39.)  Plaintiffs object that Defendants' stipulation is "illusory" because they have promised only to submit to jurisdiction they deem "appropriate" for a narrow window of time and they have agreed only to toll, not to waive, the statute of limitations.  (Opp. at 15.)  Defendants have responded that they will agree to "any reasonable rewording of their stipulation if necessary to resolve any doubt about Plaintiffs' ability to maintain civil suits in Spain following dismissal here."  (Reply at 6.)  This Court has previously approved a substantially similar stipulation in another foreign air crash case.  See Van Schijndel v. Boeing Co., 434 F. Supp. 2d 766, 773, 774–75 (C.D. Cal. 2006).  In light of this stipulation, the Court concludes that Defendants are amenable to process in Spain

Plaintiffs do not dispute, as a general matter, that the Spanish judicial system recognizes negligence and strict liability claims and allows recovery for economic and non-economic damages.  Rather, Plaintiffs contend that Spain does not provide them with an adequate alternative forum (1) because Plaintiffs face an "immeasurable delay" in obtaining adjudication of their civil claims because their civil suits will be indefinitely stayed pending resolution of the criminal proceedings against the two mechanics, and (2) because Plaintiffs will not be able to pursue claims against these defendants if they participate in the ongoing criminal proceedings.  (Opp. at 12–15.)  The Court addresses each contention in turn.

### a. Delay Resulting from Stay Pending Resolution of Criminal Proceedings

Plaintiffs explain that, under Spanish law, civil proceedings relating to the air crash must be stayed pending resolution of the related criminal proceedings.  (Opp. at 12;

1   Docket No. 255, Declaration of Santiago Alvarez Gonzalez ("Alvarez Decl.") at 3.)[1]

2   Thus, they contend, civil proceedings will be indefinitely stayed, as criminal proceedings

3   are still in the first of three phases after more than two years.  (Opp. at 14; Salvador

4   Decl. ¶¶ 17, 21; Salvador Depo. at 124:4–125:4.)  Plaintiffs emphasize that U.S. courts

5   could not properly stay proceedings for such an indefinite and potentially long period

6   and argue that the Court should not "accomplish by proxy that which it would be

7   prohibited from doing directly."  (Opp. at 13–14.)  In addition, Plaintiffs point to cases

8   holding that significant delays render alternative fora inadequate.  See Bhatnagar v.

9   Surrendra Overseas Ltd., 52 F.3d 1220, 1228 (3d Cir. 1995) (holding that Indian court's

10  backlogs creating up to 25-year delay rendered that forum inadequate).

11         The evidence does not support the premise of Plaintiff's argument, that civil

12  proceedings against Defendants cannot begin until resolution of the criminal proceedings

13  against the Spanair mechanics.  In support of their argument that civil proceedings will

14  be stayed indefinitely pending resolution of the criminal case, Plaintiffs cite Articles 111

15  and 114.1 of the Criminal Prosecution Act.  (Alvarez Decl. at 4.)  According to

16  Plaintiffs' expert, Article 111 provides that "while a criminal action is pending, a civil

17  action shall not be brought separately until such a time as the former is decided by final

18  judgment," except in certain inapplicable situations.  (Id.)  Similarly, Article 114.1

19  provides that, "[c]riminal proceedings having been instituted to look into a crime or

20  misdemeanor, no lawsuit in connection with the same matter may continue, and, if

21  already filed, it shall be suspended at its then present stage until such a time as a final

22  judgment is rendered in the criminal case."  (Id.)  Plaintiffs' expert also cites a 2004

23  Spain Supreme Court case noting that while criminal proceedings are pending, aggrieved

24

25  _____

26  [1] Defendants object to Alvarez's declaration in its entirety and request that it be stricken because
    (1) it is not certified by a qualified interpreter, (2) it lacks foundation and is not based on personal
    knowledge, (3) it is not authenticated, (4) Alvarez is not qualified as an expert in Spanish law,

27  and (5) it is based on incomplete facts and assumptions contrary to fact.  (Docket No. 280,
    Defendants' Objections at 2–4.)  Because the Court grants Defendants' motion to dismiss, it

28  **DENIES** the request to strike **as moot**.

8

persons cannot bring civil claims against parties involved in the criminal proceedings or against other persons.  (Id. at 4–5.)

Defendants' expert, Prof. Salvador, however, has persuasively countered that Article 114 was effectively repealed by Article 40 of the 2000 Civil Procedure Act. (Docket No. 278, Supplemental Declaration of Prof. Pablo Salvador-Coderch ("Supp. Salvador Decl.") ¶ 2.)  In support, Defendants' expert, Prof. Salvador, cites a 2005 opinion by the Court of Appeals of Las Palmas de Gran Canaria and a prominent treatise. (Id.)  The expert also attests that over 150 reported decisions in Spanish courts have refused to stay civil actions during the pendency of related criminal proceedings.  (Id. ¶¶ 2, 6.)  Under the new law, civil proceedings will be stayed only if the criminal decision would have a "decisive influence in the civil decision."  (Id. ¶ 2.)  Further, even where civil proceedings are stayed, the court will conduct the proceedings and suspend only the entry of final judgment pending resolution of the criminal case.  (Id. ¶¶ 2, 3.)

At the hearing on this motion, Plaintiffs attacked this explanation of the Spanish system by pointing out purported inconsistencies in Prof. Salvador's testimony.  First, Plaintiffs emphasized Prof. Salvador's deposition testimony that a victim could not "sue on the same cause of action against the same defendant in two different courts." (Salvador Depo. at 120:22–24.)  This suggests only that the victims could not pursue civil claims against Spanair or its mechanics while the criminal case was pending.  It does not suggest that victims could not pursue a different cause of action against different defendants during the pendency of the criminal case.  Second, Plaintiffs emphasized Prof. Salvador's testimony that trial could proceed "but will not be adjudicated until criminal proceedings end. . . .  Pretrial hearing will probably take place, trial will take place and then the court will stop."  (Id. at 162:24–163:6.)  This is consistent with his later declaration that a stay would only suspend entry of final judgment, not the proceedings through trial.  Finally, Plaintiffs point to Defendants' representation of the law in their opening memorandum of points and authorities, which stated that "Spanish law . . . stays any civil actions against [Spanair and its employees]

1  pending the outcome of the criminal matter." (Mem. at 7.) Again, this representation
2  does not conflict with Prof. Salvador's later declaration. Rather, this representation
3  indicates only that the civil action against <u>Spanair</u> will be stayed, and it does not specify
4  whether that stay would suspend all proceedings or only entry of final judgment. For
5  these reasons, Plaintiffs have not persuaded the Court that Prof. Salvador has incorrectly
6  described the current state of Spanish law regarding stays of civil proceedings. The
7  Court accordingly concludes that, if Plaintiffs re-file these cases in Spain, the Spanish
8  courts will either not stay those cases at all or will conduct the full proceedings and stay
9  only the entry of final judgment pending resolution of the criminal case.[2]

10      The possible delay in entering final judgment in the civil case pending
11  resolution of the criminal proceedings does not render the Spanish forum inadequate.
12  Plaintiffs contend that there is "no estimate" for how long the criminal proceedings will
13  last but cite an earlier air crash case in Spain in which criminal proceedings did not
14  conclude until 11 years after the accident.[3] (Opp. at 14; Alvarez Decl. at 13.) Even
15  assuming the criminal proceedings relevant here will take similarly long, and thus
16  assuming that final judgment in the civil proceedings cannot be entered for 11 years, this

17

---

18  [2] Plaintiffs also dispute the relevance of Defendants' evidence that a Spanish court declined to
19  stay a civil suit that thirteen plaintiffs have brought against Spanair. (<u>See</u> Docket No. 279,
    Declaration of Maria T. Cetta ("Cetta Decl.") ¶¶ 2, 4, 6–7.) Plaintiffs contend that the decision
20  not to stay that case was "a shock" and is expected to be overturned. Moreover, they contend,
    even if it is not overturned, that case does not shed light on whether a court would likely stay a
21  case against the manufacturer-defendants. That case was brought against Spanair under the
    Montreal Convention, which imposes liability without fault on the airline alone and without
22  regard to criminal responsibility. Thus, unlike in this case, whether the mechanics may have been
23  criminally responsible would not bear on Spanair's liability in that case. Although this reasoning
    is persuasive, the Court does not rely on the decision declining to stay the civil case against
24  Spanair in concluding that proceedings will not be stayed if these cases are re-filed in Spanish
    court.
25

26  [3] Plaintiffs also suggest that final resolution of claims "could take up to 20 years," but they offer
    no persuasive evidence supporting this estimate. The evidence they cite shows that it took 20
27  years to resolve a claim <u>against the government</u> relating to an air crash. (Opp. at 14; Alvarez
    Decl. at 13.) Such claims are heard in a different kind of court than the civil claims Plaintiffs
28  seek to pursue. (<u>See</u> Salvador Decl. ¶ 4.)

1   does not make the Spanish forum unavailable.  Indeed, though not desirable, complex

2   litigation of the sort presented in this case could take nearly as long to resolve in this

3   forum.  The Detroit Northwest airlines crash that Plaintiffs claim is similar to the crash

4   here was not finally resolved until just two months shy of nine years after the accident.

5   See In re Air Crash Disaster, 86 F.3d 498, 511 (6th Cir. 1996).  And that case was no

6   doubt less complicated than this case, which will likely involve application of foreign

7   law and the need to translate documentary evidence and testimony of witnesses.  The

8   Court accordingly concludes that the potential delays stemming from the need to await

9   entry of judgment pending resolution of criminal proceedings against Spanair and/or its

10  employees do not render the Spanish forum inadequate.

### b. Inadequacy Due to Participation in Criminal Proceedings

12          Plaintiffs next contend that the Spanish forum is inadequate because Plaintiffs

13  who seek compensation through the criminal proceedings will not be able to pursue

14  claims against the manufacturing defendants.  (Opp. at 15.)  In support, they point to

15  deposition testimony by Defendants' expert that "the same harm . . . cannot be fully

16  compensated twice."  (Salvador Depo. at 274:9–23.)  Thus, if the mechanics are found

17  criminally liable, they will be ordered to fully compensate plaintiffs, and plaintiffs

18  therefore will not be able to recover from the manufacturing defendants for those same

19  harms.  This argument misses the mark.  It shows only that Plaintiffs will be barred from

20  winning a windfall double recovery, not that they will not be able to recover at all.

21  Plaintiffs cannot claim that the Spanish forum is inadequate because it allows them to

22  recover for their losses only once.  Moreover, Plaintiffs will not be barred from seeking

23  recovery from the manufacturing defendants if they waive their rights to compensation

24  before the end of the criminal proceedings.  (Salvador Decl. ¶ 20.)

25          Moreover, as a practical matter, the rule against double recovery does not

26  threaten to absolve the manufacturing defendants of all liability.  If the mechanics are

27  convicted for offenses committed within the scope of their employment, their employer,

28  Spanair, will be liable for the damages.  (See Salvador Decl. ¶ ¶ 18, 63.)  Spanair would

then be able to sue other joint tortfeasors to establish their joint and several liability. (Alvarado Decl. at 6–7 (explaining that a person "convicted in criminal proceedings can bring a civil action against parties who may be concurrently liable" and that a civil complaint against the U.S. manufacturers "would most probably only determine whether the manufacturers are jointly and severally liable for an amount equal to the amount of the criminal judgment").)

For these reasons, the Court concludes that the bar against double recovery does not render the Spanish forum inadequate.  Spain is an available and adequate alternative forum, and Defendants have met their burden to satisfy the first requirement for dismissal on <u>forum non conveniens</u> grounds.

### 2. PRIVATE AND PUBLIC INTEREST FACTORS

The Court must next weigh the private and public interest factors.  To show that the private and public interest factors favor dismissal, a defendant must show "facts which either (1) establish such oppressiveness and vexation to a defendant as to be out of all proportion to plaintiff's convenience, which may be shown to be slight or nonexistent, or (2) make trial in the chosen forum inappropriate because of considerations affecting the court's own administrative and legal problems."  <u>Koster v. (Am.) Lumbermens Mut. Cas. Co.</u>, 330 U.S. 518, 524 (1947); <u>accord</u> <u>Piper Aircraft</u>, 454 U.S. at 241.  The Court concludes that the private and public interest factors both favor dismissal and that trial in a U.S. forum would be inappropriate because of the Court's own administrative concerns.

#### a.  Private Interest Factors

Private interest factors include "(1) the residence of the parties and the witnesses; (2) the forum's convenience to the litigants; (3) access to physical evidence and other sources of proof; (4) whether unwilling witnesses can be compelled to testify; (5) the cost of bringing witnesses to trial; (6) the enforceability of the judgment; and (7) all other practical problems that make trial of a case easy, expeditious and inexpensive."  <u>Cariajano</u>, 626 F.3d at 1151 (quoting <u>Boston Telecomms. Grp. v. Wood</u>, 588 F.3d 1201,

1206–07 (9th Cir. 2009)).  The Court addresses the factors relating to witnesses—the first, fourth, and fifth—together and then addresses the remaining factors in turn.

### 1.  Residence of Parties and Witnesses, Whether Unwilling Witnesses Can be Compelled to Testify, and the Cost of Bringing Witnesses to Trial

In evaluating the private interest factors relating to witnesses, the Court focuses "not on the number of witnesses . . . in each locale," but rather "evaluate[s] 'the materiality and importance of the anticipated witnesses' testimony and then determine[s] their accessibility and convenience to the forum.'"  Lueck, 236 F.3d at 1146 (quoting Gates Learjet Corp. v. Jensen, 743 F.2d 1325, 1335–36 (9th Cir. 1984)) (alterations omitted).

Plaintiffs all reside outside of the United States and Defendants all are incorporated in and have their principal places of business in the United States.[4]  None of the defendants is incorporated in California, and only Leach has its principal place of business in this state, in Buena Vista.  (Winter Decl. ¶¶ 6–11.)  MDC had its principal place of business in California, but it is no longer a separate legal entity from Boeing.  Defendants, however, requested consolidation in the Central District of California because, as compared to the Middle District of Florida and the Northern District of Illinois—the other courts in which actions were filed—this forum "is more centrally located to the defendants' operations and certain documents and witnesses."  (Id. ¶ 12.)

Both Spain and the United States are home to sets of witnesses.  Plaintiffs point to witnesses relevant to establishing a defect in the aircraft who reside in the United States, while Defendants point to witnesses relevant to other potential causes of the crash and to damages, who reside in Spain and elsewhere.  In particular, the United States is

---

[4] Of the Plaintiffs, 193 are Spanish, three are German, three are Turkish, two are Gambian, two are Indonesian, and one is Swedish.  (Winter Decl. ¶ 3.)  These plaintiffs represent 100 passengers, 92 of which are Spanish, three German, one Brazilian, one Gambian, one Indonesian, one Swedish, and one Turkish.  (Id. ¶ 4.)

home to FAA and NTSB representatives and others who participated in the certification of the MD-82 design, the investigation of the allegedly similar Detroit crash, the examination of certification requirements after the Detroit crash and other incidents, Defendants' outreach to notify operators of the problems, and design and certification of TOWS. On the other hand, many liability witnesses reside in Spain, including current and former Spanair employees, air traffic controllers, eyewitnesses, accident investigators, aviation regulators, and personnel who planned and participated in rescue operations. In addition, almost all damages fact witnesses reside in Spain, including Plaintiffs, spouses, relatives, friends, employers, health care providers, and accountants.[5]

All of this evidence is highly relevant to each side's case. Plaintiffs seek to present testimony by people involved with certifying the MD-82 and TOWS designs and with investigating the Detroit crash and examining certification requirements in its aftermath. This testimony, they say, will help them prove the existence of a defect and negligence on the part of Defendants to support their strict products liability and negligence theories of recovery. Defendants minimize the importance of this evidence, arguing that neither TOWS nor the R2-5 relay was found to have failed in the Detroit crash and that the TOWS design has since changed. (Reply at 1.) These arguments, however, dispute the materiality of Plaintiffs' evidence on the merits, not the materiality to Plaintiffs' case as they have framed it.

Defendants' evidence is also relevant to their case. Defendants contend that they are not responsible for the accident because Spanair's mechanics failed to correct the overheating RAT probe and because Spanair's pilots failed to set the slats and flaps for takeoff, failed to perform three mandatory checks of those slats and flaps, and failed to respond to multiple other takeoff configuration warnings. (Reply at 2.) Testimony of

---

[5] Plaintiffs object that Defendants have not identified foreign witnesses with sufficient particularity, as they describe only categories of possible witnesses rather than individual people. (Opp. at 19.) "Defendants' identification of categories of witnesses is sufficient to balance the parties' interests," however. Van Schijndel, 434 F. Supp. 2d at 778.

Spanair employees, air traffic controllers, eyewitnesses, and accident investigators will plainly be material to making out this case. Thus, as in the <u>Van Schijndel</u> case regarding the Singapore air crash, Defendants will try to prove that the owner-operator "improperly maintained the . . . equipment and that Plaintiffs' injuries were caused by the crash itself, the crew's actions, improper maintenance, or other factors and not by the equipment's alleged defect or malfunction." <u>Van Schijndel</u>, 434 F. Supp. 2d at 777. As in that case, Defendants' liability witnesses in Spain are "quite relevant" to the case. <u>Id.</u>

If the action were maintained here, Defendants would be required to obtain the testimony of witnesses in Spain through letters rogatory pursuant to the Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Matters. (Salvador Decl. ¶ 47.) This process has limitations, and courts have noted its shortcomings, however. <u>See, e.g.</u>, <u>Melgares v. Sikorsky Aircraft Corp.</u>, 613 F. Supp. 2d 231, 243 n.8 (D. Conn. 2009) (describing obtaining testimony of Spanish witnesses through letters rogatory as "a difficult and time-consuming—if not altogether futile—endeavor"); <u>Da Rocha v. Bell Helicopter Textron, Inc.</u>, 451 F. Supp. 2d 1318, 1325 (S.D. Fla. 2006) (describing letters rogatory as "notoriously inefficient"). The Hague Convention would not allow Defendants to compel live testimony at trial. <u>See Mastafa v. Australian Wheat Bd. Ltd.</u>, No. 07-7955, 2008 WL 4378443, at *8 (S.D.N.Y. Sept. 25, 2008). Instead, they would have to rely on deposition transcripts. The Supreme Court has noted that holding a trial at a location "where litigants cannot compel personal attendance and may be forced to try their cases on deposition, is to create a condition not satisfactory to court, jury or most litigants." <u>Gulf Oil Corp. v. Gilbert</u>, 330 U.S. 501, 511 (1947), <u>superseded by statute on other grounds as recognized in</u> <u>In re Air Crash Over Taiwan Straits on May 25, 2002</u>, 331 F. Supp. 2d 1176, 1180 (C.D. Cal. 2004).

Plaintiffs could face similar difficulties obtaining witnesses in Spain. Although Defendants have promised to "make available in Spain all evidence and witnesses located in the U.S. within their possession, custody, or control that the Spanish court

1   deems relevant" (Winter Decl. ¶ 2), Defendants do not exercise control over all potential

2   witnesses, including FAA and NTSB officials and former MDC employees.  If this

3   action proceeded in Spain, Plaintiffs would have to obtain the testimony of these U.S.

4   witnesses through letters rogatory or pursuant to 28 U.S.C. § 1782, which allows a

5   district court to order a person to "give testimony . . . for use in a proceeding in a foreign

6   . . . tribunal."  28 U.S.C. § 1782(a).  This procedure, like the procedure prescribed by the

7   Hague Convention, would not allow parties to compel live witness testimony.  See id.

8        Both parties will also face limits on their ability to engage in pre-trial discovery

9   if these cases are not litigated in their forum of choice.  If this case is litigated in Spain,

10  Defendants have promised only to make available that evidence and those witnesses

11  "that the Spanish court deems relevant."  (Winter Decl. ¶ 2.)  According to Plaintiffs, this

12  shifts the burden on Plaintiffs to make out a case of relevance before obtaining the

13  evidence that would prove relevance.  The Court is not persuaded, however, that this

14  purported barrier is substantially different than the relevance obligation on one seeking

15  discovery under the Federal Rules.  Moreover, Defendants face a similar, if not more

16  substantial, barrier to their pre-trial discovery if these cases are tried here.  Spain does

17  not honor letters rogatory requesting pre-trial discovery.  (Salvador Decl. ¶ 47; see also

18  Hague Convention on the Taking of Evidence Abroad, 23 U.S.T. 2555, Art. 23 ("A

19  Contracting State may . . . declare that it will not execute Letters of Request issued for

20  the purpose of obtaining pre-trial discovery of documents as known in Common Law

21  countries."); Philip W. Amram, Explanatory Report on the 1970 Hague Evidence

22  Convention at 4 (1970), available at http://hcch.e-vision.nl/upload/expl20e.pdf

23  (explaining that Article 23 "refers to a procedure by which one of the Parties to an action

24  may obtain access, before trial, to documents in the possession of his adversary, to aid

25  him in the preparation of his pleadings or in preparation for trial").  Defendants will

26  accordingly not be able to obtain testimony relevant to their case before trial.

27        Thus, no matter where these suits are tried, one side will face difficulty in

28  gathering evidence and presenting witnesses for its case.  If the cases go forward here,

Defendants will have to rely on cumbersome letters rogatory to get deposition testimony from foreign individuals with information relevant to the question of what or who was responsible for the crash.  If the cases go forward in Spain, Plaintiffs will similarly get only deposition testimony from some witnesses with information relevant to a design defect in the aircraft and to the possible negligence of Defendants.  In either situation, the out-of-country evidence will be central to one party's case.

Although the comparative <u>availability</u> of witnesses may thus be in equipoise, the relative <u>costs</u> of bringing witnesses to trial is not.  Those costs will likely be greater if this case is tried in this forum.  Over 200 plaintiffs have brought suit on behalf of 100 victims of the crash.  Damages testimony—from family, friends, and doctors—will be necessary for each of the 100 victims.  All plaintiffs and the decedents they represent are from outside of the United States.  The cost of travel for these witnesses alone is extremely high.  Because almost all of the decedents come from Spain, the costs associated with obtaining testimony from those witnesses in that country would be far lower.  If these cases proceed in Spain, Defendants will have to bear the cost of bringing their U.S.-based representatives there to testify.  There are far fewer such U.S.-based witnesses, however.  These witnesses will all offer testimony relevant to liability, a question common to all 204 plaintiffs.  Thus, there will almost certainly be far fewer U.S.-based witnesses traveling to Spain than Spain-based witnesses traveling to the U.S. to provide individualized damages evidence for each plaintiff.

In light of the significant disparity in cost, the Court concludes that the witness-related factors slightly favor dismissal.

### 2.  Forum's Convenience to the Litigants

This forum is plainly closer to home for Defendants, while the alternative Spanish forum is closer to home for Plaintiffs.  But Plaintiffs wish to litigate here, while Defendants wish to litigate in Spain.  Thus, both parties have shown their willingness to accept the inconvenience associated with geography.  Plaintiffs, however, contend that Spain is an inconvenient forum for them because no single court would have jurisdiction

1    over all the parties the Defendants claim should be included, including the airline, the

2    manufacturers, rescue personnel, and airport operators.  (Opp. at 19–20.)  That, however,

3    is also true here; this Court cannot exercise jurisdiction over all parties either.  The Court

4    concludes that this factor is neutral.

5                         **3.  Access to Physical Evidence and Other Sources of Proof**

6            As with witnesses, physical evidence exists in both the U.S. and Spain.  On the

7    one hand, documents relating to the design and certification of the MD-82 and TOWS

8    and to the Detroit crash and investigation are present in the U.S.  On the other hand,

9    several categories of evidence relevant to liability are in Spain: the accident site, the

10   aircraft wreckage, the aircraft's flight data and cockpit voice recorders, recordings of air

11   traffic/ground control communications with the flight crew, Spanair hiring and training

12   records, Spanair flight operations records, Spanair maintenance records for the aircraft

13   and component parts, information developed by the official investigation, and regulatory

14   documents.  (Dodt Decl. ¶¶ 18–24.)  In addition, most evidence relevant to computing

15   damages is present in Spain, including the victims' employment, financial, and medical

16   records, records of funeral expenses, and documents evidencing non-economic damages.

17   Plaintiffs object that Boeing actually has a lot of the purportedly Spain-based data in its

18   possession because it participated in the investigation by Spanish authorities.  (Opp. at

19   5–7.)  Although Boeing does admit to having some evidence, including a transcript of

20   the cockpit voice recorder, it does not have access to all such evidence.

21   (See Steelhammer Depo. 73–76.)  Moreover, as this Court has noted before, "the fact

22   that Boeing may have participated or assisted in some form in the investigation of the

23   crash does not imply that Defendants have access to any of the other records of that

24   investigation."  Van Schijndel, 434 F. Supp. 2d at 777.  Thus, evidence is present in both

25   the U.S. and Spain.  For the reasons set forth above in the discussion regarding

26   witnesses, this evidence is material to the Defendants' and Plaintiffs' respective cases.

27           This evidence would be obtainable regardless of the forum.  The U.S. and Spain

28   are both signatories to the Hague Convention on the Taking of Evidence Abroad, which

18

provides a way to obtain evidence from entities and individuals in foreign jurisdictions. In addition, litigants in foreign tribunals can seek production of documents from people in the U.S. pursuant to 28 U.S.C. § 1782. Spain does not allow requests for pre-trial discovery of documents, but otherwise follows the Convention. Plaintiffs acknowledged at the hearing that documents are portable and could be used in Spanish court. Although Defendants claim that they cannot obtain information from the CIAIAC's investigation because only a Spanish court, not a U.S. court, can order disclosure of investigation evidence, they did not explain why they could not use the procedures established by the Hague Convention to enlist the help of a Spanish court in ordering the disclosure of those documents. Only the actual accident site is not obtainable in a foreign forum, but it is unlikely that a finder of fact would have to visit the site given Defendants' theories of the accident's cause—the site will not reveal what happened on the plane before the crash. For these reasons, it appears that either party will be able to obtain its evidence, regardless of the forum. The Court will therefore focus on the convenience of obtaining that evidence.

Most of the evidence is documentary. All of the evidence in the United States—records regarding design and certification of the aircraft and the prior Detroit accident and investigation—are documentary. Most of the Spain evidence is documentary, too, with the notable exception of the accident site, aircraft wreckage, flight data and cockpit voice recorders, and recordings of air traffic/ground control communications. Although documentary evidence is relatively easily portable given modern technology, documents' "physical location remains a pertinent consideration." Sarandi v. Breau, No. 08-2118, 2009 WL 2871049, at *7 (N.D. Cal. Sept. 2, 2009). However, the documents' location is "not a compelling consideration," especially because documentary evidence is present in both fora. See Medisim Ltd. v. BestMed LLC, No. , 2010 WL 2697073, at *2 (S.D.N.Y. July 7, 2010) ("The location of documents . . . is not a compelling consideration when records are easily portable." (internal quotations omitted)).

To be sure, the U.S.-based documents are in large part technical, and technical documents are harder and costlier to translate.  However, any inconvenience in translating the technical data is more than offset by the drawbacks associated with translating the cockpit voice recording.  As Defendants' representative attested, transcripts of a cockpit voice recording are helpful, "but they are no substitute for listening to the audio recording of those words and their inflection and tone in the context of cockpit sounds."  (Dodt Decl. ¶ 19.)  This is particularly true given that Defendants seek to establish, among other things, that the pilots failed to perform required checks or to respond to other warnings.  Thus, what happened in the cockpit immediately before the crash is of central importance.  Voice recordings lose far more in translation than do documents containing technical data.

In sum, material evidence is present in both the U.S. and Spain, and almost all evidence is obtainable in both locations.  Although it may be more complicated to translate U.S.-based technical data regarding design and certification into Spanish, that inconvenience is more than offset by the inability of U.S.-based factfinders to actually listen to what happened in the cockpit before the crash.  The access to physical evidence factor accordingly slightly favors dismissal.

### 4. Enforceability of the Judgment

Defendants have stipulated to "satisfy any final, post-appeal judgment awarded against them in Spain."[6]  (Winter Decl. ¶ 2.)  The enforceability of the judgment factor is therefore at least neutral.  See Van Schijndel, 434 F. Supp. 2d at 779 (concluding that enforceability of judgment factor was "at least neutral" where Defendants agreed to pay any final, post-appeal judgment awarded against them by foreign court).

---

[6] Plaintiffs object that this promise is illusory because the judgments might not be collectable when they become final, likely decades in the future.  (Opp. at 21.)  For the reasons set forth above, Plaintiffs' predictions about the likely duration of proceedings in Spain are unpersuasive, and this objection accordingly fails.

**5.  Other Practical Problems**

The Court must next consider two additional "practical problems" that could weigh in favor of or against allowing the suits to go forward in the U.S.  On the one hand, Plaintiffs contend that they face serious financial impediments to suing in Spain because contingency fee arrangements are uncommon and because they could be liable to pay Defendants' costs, including attorneys' fees.  (Opp. at 21.)  On the other hand, Defendants argue that proceeding in this forum would prejudice them because they could not join Spanair as a third-party defendant.  (Mem. at 17.)  The Court addresses each of these "practical problems" in turn.

a.  Plaintiffs' Financial Impediments to Suit in Spain

A party's claim of financial hardship can be "a factor to be considered in the balancing of interests that bear on convenience." Wilson v. Island Seas Investments, Ltd., 590 F.3d 1264, 1271–72 (11th Cir. 2009) (quoting Gross v. British Broad. Corp., 386 F.3d 224, 231 (2d Cir. 2004)).  Plaintiffs contend that they face "serious financial impediments" to bringing suit in Spain because of the potential liability for Defendants' attorneys' fees and the lack of access to contingency fee arrangements.

As to the potential liability for Defendants' attorneys' fees, the Court is persuaded by a Seventh Circuit opinion holding that the availability of fee-shifting in the alternative forum does not qualify as a significant private interest factor weighing against dismissal.  See In re Factor VIII or IX Concentrate Blood Prods. Litig., 484 F.3d 951, 958 (7th Cir. 2007).  As the Seventh Circuit explained, the Supreme Court in Piper Aircraft held that an unfavorable change in law cannot significantly weigh in favor of dismissal under the forum non conveniens doctrine.  Id.  The possibility of fee-shifting is "[o]bviously . . . less favorable to plaintiffs whose chances of losing are too great . . . , but we believe that must be regarded as the kind of unfavorable difference in legal system that carries little weight." Id.  Because the United States "stands almost alone" in requiring each side to bear its own attorneys' fees, finding the possibility of fee-shifting in a foreign forum to weigh significantly against dismissal "would risk gutting the

doctrine of <u>forum non conveniens</u> entirely." <u>Id.</u>  For this reason, Plaintiffs' potential liability for Defendants' attorneys' fees in Spain does not weigh against dismissal here.

This Court similarly concludes that the relative unavailability of contingency fee arrangements in Spain does not counsel against dismissal.  As with fee-shifting, the U.S. is an outlier on contingency fee arrangements.  <u>See</u> <u>Coakes v. Arabian Am. Oil Co.</u>, 831 F.2d 572, 576 (5th Cir. 1987) ("[C]ontingency fees are not allowed in most forums.")  Thus, if the unavailability of contingency fee arrangements weighed against dismissal, it would likely weigh against dismissal in every case.  This factor therefore does not deserve "substantial weight" in the balancing.  <u>See</u> <u>Magnin v. Teledyne Cont'l Motors</u>, 91 F.3d 1424, 1430 (11th Cir. 1996).

Further, Plaintiffs have argued only that they will face "serious financial impediments."  (Opp. at 21.)  Notably, they have not argued, or pointed to any evidence, that these financial impediments will be prohibitive.  Particularly in the absence of such evidence, the Court concludes this factor weighs at most only slightly against dismissal.

### b.  Defendants' Inability to Join Spanair in the U.S.

Courts have consistently found a defendant's inability to implead other parties potentially responsible for an air crash to be a significant factor favoring dismissal.  In <u>Piper Aircraft</u>, the Supreme Court held that the defendants' inability to join potential third-party defendants, including the pilot and the owners and operators of the aircraft, counseled in favor of dismissal.  <u>See</u> <u>Piper</u>, 454 U.S. at 259.  Although the defendants could seek contribution or indemnification from those potential defendants in a second suit in the foreign forum if they were held liable in the U.S. forum, "[i]t would be far more convenient . . . to resolve all claims in one trial."  <u>Id.</u>  Following <u>Piper</u>, courts have found defendants' inability to implead potential third-party defendants a significant factor favoring dismissal.  <u>See</u> <u>Van Schijndel</u>, 434 F. Supp. 2d at 780; <u>Gambra v. Int'l Lease Fin. Corp.</u>, 377 F. Supp. 2d 810, 823 (C.D. Cal. 2005) ("[T]he fact that [the airline] cannot be compelled to appear as a defendant in the United States is a substantial consideration weighing in favor of dismissal.").  As the Eleventh Circuit explained, these

22

1  circumstances are prejudicial because an airplane manufacturer's defense that other

2  entities were responsible for a crash "is surely less persuasive when aimed at a set of

3  empty chairs." Satz v. McDonnell Douglas Corp., 244 F.3d 1279, 1284 n.4 (11th Cir.

4  2001). As another court has explained, "as a practical matter, the trier of fact cannot be

5  expected to evaluate fairly the relative liability of parties not present at the trial." Nai-

6  Chao v. Boeing Co., 555 F. Supp. 9, 19 (N.D. Cal. 1982).

7       Defendants argue that they would be prejudiced by the absence in this forum of

8  other parties potentially responsible for the accident, most notably Spanair. Plaintiffs do

9  not challenge this in theory, but rather dispute the premise of the argument, arguing that

10  Spanair could be joined in this action. (Opp. at 11.) In particular, Plaintiffs contend that

11  Spanair has an office in the U.S., operates flights in and out of Philadelphia, and has

12  availed itself of U.S. Courts, including filing one suit in this Court. (Opp. at 11.)

13  Plaintiffs' argument does not hold water. The evidence submitted in support shows that

14  Spanair lists an office in Washington, D.C. (Docket No. 267, App., Ex. R.) Even if

15  Spanair did maintain an office in D.C. and operate flights in and out of Philadelphia, that

16  would not mean that this Court in California, or the courts in Florida and Illinois, would

17  have personal jurisdiction over Spanair. Moreover, Plaintiffs do not cite any authority

18  indicating that a court will forever have personal jurisdiction over an entity if it at any

19  time chooses to bring a suit in that court. The Court is certain no such authority exists.

20       Moreover, a declaration by counsel for Spanair explains that Spanair does not in

21  fact own or operate any office in the United States, and that the U.S. address listed on its

22  website is for Discover the World Marketing, a travel sales outsource solution. (Cetta

23  Decl. ¶ 9.) Similarly, the Spanair counsel attests that Spanair does not operate any

24  passenger services into or out of the U.S., although its website does sell tickets on a

25  USAirways flight between Philadelphia and Madrid pursuant to a code-share agreement.[7]

26

27      [7] Plaintiffs object that Spanair's counsel does not have personal knowledge of Spanair's U.S.
presence or flights into or out of the country. (Docket No. 287, Plaintiffs' Objections at 9–10.)

28  Counsel's declaration is not necessary to the conclusion that this Court could not assert personal

(Id. ¶ 10.)  Finally, Spanair's counsel explains that Spanair only brought the suit in this Court that Plaintiffs identify because this was the only forum with personal jurisdiction over all defendants.  (Id. ¶ 12.)  Finally, although Spanair has been named as a defendant in two other U.S. suits, it has contested personal jurisdiction in one and was never served in the other.  (Id. ¶ 11.)

Given Spanair's lack of contacts with the United States, and more importantly with California, Illinois, and Florida, this Court and the other courts in which these suits were brought almost certainly do not have personal jurisdiction over it.  Defendants therefore will not be able to join Spanair in these suits, and will suffer prejudice in having to try an "empty chair."  This factor therefore significantly favors dismissal.

### 6.  Summary of Private Interest Factors

In sum, the Court concludes that (1) the factors relating to the availability of witnesses and costs of witness attendance slightly favor dismissal, (2) that the convenience to the parties factor is neutral, (3) that the ease of access to sources of proof slightly favors dismissal, (4) that the enforceability of the judgment factor is neutral, (5) that the financial hardship to Plaintiffs weighs slightly against dismissal, and (6) that Defendants' inability to implead Spanair in this forum significantly favors dismissal. The balance of the private interest factors thus favors dismissal.

### b.  Public Interest Factors

Public interest factors include "(1) the local interest in the lawsuit, (2) the court's familiarity with the governing law, (3) the burden on local courts and juries, (4) congestion in the court, and (5) the costs of resolving a dispute unrelated to a particular forum."  Cariajano, 626 F.3d at 1153–54 (quoting Boston Telecomms. Grp., 588 F.3d at 1211).  The Court addresses each in turn.

---

jurisdiction over Spanair, however, because Plaintiffs' citation to contacts with Pennsylvania and D.C. does not establish sufficient contacts with the forums in which these cases were brought.

1  **1.  Local Interest in the Lawsuit**

2      Spain plainly has a significant local interest in this lawsuit.  The accident

3  occurred in Spain as a Spanish airline with Spanish pilots and crew and carrying mostly

4  Spanish passengers attempted to fly from one Spanish city to another.  The significance

5  of Spain's local interest cannot be disputed.  See Satz, 244 F.3d at 1284 (holding that

6  Argentina had the stronger interest where "[a]lmost all of the passengers on the flight

7  were Argentine citizens, none of the passengers were citizens of the United States, and

8  [the airline was] an Argentine airline that [did] not operate in the United States"); Lueck,

9  236 F.3d at 1147 (holding that New Zealand had "extremely high" local interest where a

10  "crash involved a New Zealand airline carrying New Zealand passengers" and where

11  local media had covered the accident, its investigation, and following proceedings); In re

12  Air Crash Over Taiwan Straits on May 25, 2002, 331 F. Supp. 2d 1176, 1204 (C.D. Cal.

13  2004) (finding "overwhelming[]" connection to Taiwan where crash involved a

14  Taiwanese airline's aircraft that crashed in Taiwanese waters after taking off from

15  Taiwan, killing mostly Taiwanese citizens and residents).

16      On the other hand, courts have recognized a local interest in air crash cases

17  against airplane and parts manufacturers with local ties.  See, e.g., Lueck, 236 F.3d at

18  1147 (noting that "citizens of Arizona certainly have an interest in the manufacturing of

19  defective products by corporations located in their forum"); In re Air Crash Disaster

20  Near Palembang, Indonesia, No. MDL 1276, 2000 WL 33593202, at *3 (W.D. Wash.

21  Jan. 14, 2000) (finding a "substantial local connection" where aircraft was manufactured

22  by one of the "biggest corporations and . . . largest employers in" the state, and where the

23  kind of aircraft "carrie[d] a great number of passengers into and out of this district every

24  day"); Jennings v. Boeing Co., 660 F. Supp. 796, 807 (E.D. Pa. 1987) (acknowledging

25  that the state where a helicopter was manufactured had "an interest in cases involving

26  alleged defects in the aircraft"); Grimandi v. Beech Aircraft Corp., 512 F. Supp. 764,

27  780 (D. Kan. 1981) (noting that litigation had "a relationship to th[e] community" where

28  airplane was manufactured).

This interest, however, has rarely trumped the interest of a foreign state with ties to the crash, and more particularly to the crash victims, like those here. See Lueck, 236 F.3d at 1147 (finding local interest "comparatively low"); Jennings, 660 F. Supp. at 807 (finding the local interest "far less in comparison"); Grimandi, 660 F. Supp. at 807 (holding that case was not a "localized controversy"). The Supreme Court spoke to the issue in Piper Aircraft, where it held that the American interest in "ensuring that American manufacturers are deterred from producing defective products" was "simply not sufficient to justify the enormous commitment of judicial time and resources that would inevitably be required if the case were to be tried here." Piper Aircraft, 454 U.S. at 260–61. Even though additional "incremental deterrence" might be gained through a trial in an American forum, the American interest did not outweigh the interest of the country that was the site of the accident, the home of all decedents, and the home of most potential plaintiffs and defendants. Id. Following Piper Aircraft, courts have regularly found that the local interests of a country that was the site of an accident and the home of most plaintiffs trumped any American forum's interest in deterring the local manufacture of defective products. See, e.g., Satz, 244 F.3d at 1284; Lueck, 236 F.3d at 1147; In re Air Crash Over Taiwan Straits on May 25, 2002, 331 F. Supp. 2d at 1204–06; Jennings, 660 F. Supp. at 807–09; Nai-Chao, 555 F. Supp. at 20.

Undeterred, Plaintiffs urge this Court to follow the Western District of Washington's decision In re Air Crash Disaster Near Palembang, Indonesia, which held that connections to the district were sufficiently strong to "justify the expenditure of public resources on resolution of the dispute" where the manufacturer-defendant was "among the biggest corporations and the largest employers" in the state, and where the type of aircraft involved in the crash was "a very popular plane which carries a great number of passengers into and out of this district every day." In re Air Crash Disaster Near Palembang, Indonesia, 2000 WL 33593202, at *3. Plaintiffs' reliance on this case is misplaced, however, because the court's decision there was strongly influenced by the presence of American victims and plaintiffs. See id. The Court emphasized that at least

three of the victims whose relatives had brought claims were American citizens and reasoned that dismissal "would deny United States citizens access to United States courts for wrongful death claims brought on behalf of United States decedents against a United States manufacturer."  Id.  The court further noted that it must "be particularly deferential to the plaintiff's choice of forum when that plaintiff is a United States citizen."  Id.  Because no American plaintiffs are involved in this case, the Court owes the Plaintiffs' choice of forum less deference.  Piper Aircraft, 454 U.S. at 255.

For these reasons, Spain's local interest is significantly stronger than the interest this forum has in deterring American manufacturers from making defective airplanes and parts.  This factor therefore strongly favors dismissal.

### 2.  Court's Familiarity with the Governing Law

"The doctrine of forum non conveniens . . . is designed in part to help courts avoid conducting complex exercises in comparative law. . . .  [T]he public interest factors point towards dismissal where the court would be required to 'untangle problems in conflict of laws, and in law foreign to itself.'"  Piper Aircraft, 454 U.S. at 251 (quoting Gulf Oil, 330 U.S. at 509).  Where a case does not "implicate any United States law which mandates venue in the United States district courts, . . . the applicability of United States law to the various causes of action 'should ordinarily not be given conclusive or even substantive weight.'"  Gemini Capital Grp., Inc. v. Yap Fishing Corp., 150 F.3d 1088, 1092, 1094 (9th Cir. 1998).  Because no law in this case requires venue in a United States court, the Court would not be deterred from dismissing this action even if U.S. law applied to Plaintiffs' claims.  In other words, because this forum's comparatively small interest in this case strongly favors dismissal, the choice of law analysis, no matter the conclusion, will not affect the ultimate decision to dismiss. The Court therefore need not determine what substantive law will apply to Plaintiffs' claims.  See Lueck, 236 F.3d at 1148 ("Because there is no arguably applicable law that would end the forum non conveniens inquiry in this case, no potentially dispositive choice of law determination need have been made." (internal quotations and alteration

omitted)); <u>Kinjo v. Champion Shipping AS</u>, No. 09-3603, 2010 WL 3069343, at *7 (E.D. Cal. Aug. 4, 2010) ("Given California's negligible interest in providing a forum for this action, this complex [choice-of-law] analysis is not a task that the court feels compelled to undertake."); <u>Jennings</u>, 660 F. Supp. at 809 n.12 ("Because the other private and public interest factors point strongly toward dismissal of this action, I need not decide whether foreign law, as a matter of choice of law principles, would govern this case.").

Nonetheless, it appears likely that Spanish law would apply to most Plaintiffs' claims.  Ordinarily, a court applies the choice-of-law rules of the state in which it sits. <u>Piper Aircraft</u>, 454 U.S. at 243 n.8 (citing <u>Klaxon v. Stentor Elec. Mfg. Co.</u>, 313 U.S. 487 (1941)).  When a case is transferred, however, a court must apply the choice-of-law rules of the state in which the action was originally filed.  <u>Id.</u>; <u>accord</u> <u>In re Air Crash Disaster Near Chicago, Ill.</u>, 644 F.2d 594, 610 (7th Cir. 1981).  Thus, this court must apply the choice-of-law rules of California, Illinois, and Florida to determine the applicable substantive law here.

In California, choice-of-law is governed by the "government interest analysis." <u>See</u> <u>CRS Recovery, Inc. v. Laxton</u>, 600 F.3d 1138, 1142 (9th Cir. 2010).  This analysis involves three steps that compare the jurisdictions' substantive laws, assess each jurisdiction's interest in having its law applied, and determine which jurisdiction's interests would be more impaired if its law were not applied.  <u>Id.</u> (quoting <u>Abogados v. AT & T, Inc.</u>, 223 F.3d 932, 934 (9th Cir. 2000).  Notably, applying this test would involve just the kind of exercise in comparative law that the <u>forum non conveniens</u> doctrine is designed to avoid.  <u>See</u> <u>Piper Aircraft</u>, 454 U.S. at 251.  A cursory look at this test, however, suggests that the Court would have to apply Spanish law to Plaintiffs' claims.  Applying the California choice-of-law test in <u>Nai-Chao</u>, the district court concluded that Chinese law would likely apply in a case against an airplane manufacturer arising out of an aircrash in Taiwan.  <u>Nai-Chao</u>, 555 F. Supp. at 20–21.  To be sure, the persuasive value of this case is limited because it involved a comparison

with Chinese, not Spanish, law.  The Chinese and Spanish governments, however, likely have similar interests in air crashes on their soil that kill their citizens.  <u>Nai-Chao</u> thus suggests that Spanish law would apply to the claims of Plaintiffs in this Court.  The mere likelihood or possibility that foreign law would apply weighs in favor of dismissal.  <u>See</u> <u>Lueck</u>, 236 F.3d at 1148 n.6 ("[B]ecause New Zealand law is <u>likely</u> to apply in this suit, the choice of law determination weighs in favor of dismissal." (emphasis added)); <u>Satz</u>, 244 F.3d at 1284 (upholding district court's determination that public interest factors favored dismissal where there was "a <u>possibility</u> that the district court would have to apply Argentine law to decide this case" (emphasis added)); <u>Jennings</u>, 660 F. Supp. at 809 n.12 ("The fact that foreign law <u>may be applicable</u> to an action is often cited as a reason supporting dismissal." (emphasis added)).

For the suits brought in Illinois and Florida, the choice-of-law analysis is governed by the "most significant relationship" test as set forth in the Restatement (Second) of Conflict of Laws.  <u>Grupo Televisa, S.A. v. Telemundo Commc'ns Grp., Inc.</u>, 485 F.3d 1233, 1240 (11th Cir. 2007) (Florida); <u>Sys. Dev. Integration, LLC v. Computer Sciences Corp.</u>, – F. Supp. 2d –, 2010 WL 3699978, at *12 (N.D. Ill. Sept. 13, 2010) (Illinois).  Under that test, the law of the state with the "most significant relationship to the occurrence and the parties" governs.  <u>Grupo Televisa</u>, 485 F.3d at 1240 (quoting Restatement (Second) of Conflict § 145).  Relevant contacts include "(a) the place where the injury occurred, (b) the place where the conduct causing the injury occurred, (c) the domicil, residence, nationality, place of incorporation and place of business of the parties, and (d) the place where the relationship, if any, between the parties is centered."  <u>Id.</u>  Applying this test, courts have concluded that a foreign forum's law likely applied in a suit against an aircraft manufacturer arising out of the deaths of foreign victims in a crash on foreign soil.[8]  <u>See</u> <u>Macedo</u>, 693 F.2d at 686, 690 (holding that "Portugese law

---

[8] The Court further notes that, even if domestic law applied, the forum states would not likely apply their own law.  Although the aircraft was manufactured in California (Winter Decl. ¶ 6), only Defendants Leach and Boeing have ties to any forum state.  Leach has its principal place

would surely be applicable to many" issues in an air crash case "involving a Portuguese airline, an airport in Portugal, [and] predominantly Portuguese plaintiffs"); <u>Da Rocha</u>, 451 F. Supp. 2d at 1325–26 (holding that "it seems likely that because the Plaintiffs are Brazilian, they were injured in Brazil, the accident occurred in Brazil and their relationship to Bell Helicopter and Rolls Royce would be centered in Brazil where they boarded the helicopter, Brazilian law will apply to the issue of liability"). In light of these authorities, the Court concludes that Spanish law likely applies to the suits brought in Florida and Illinois.

To be sure, if these cases are litigated in a Spanish forum, the laws of various U.S. states may apply to the claims of non-Spanish plaintiffs who elect to apply U.S. law. But Spanish law will undisputedly apply to the claims of the plaintiffs representing the 92 Spanish victims, the vast majority of plaintiffs. (<u>See</u> Supp. Salvador Decl. ¶ 9; Alvarez Decl. at 28; Opp. at 23.) Even assuming, as Plaintiffs contend, that the Hague Convention on the Law Applicable to Products Liability would apply to Plaintiffs' claims in the Spanish forum, that Convention makes clear that Spanish law would apply to the claims on behalf of the Spanish victims. Under Article 4 of that Convention, the law of the "State of the place of injury" applies if "that State is also . . . the place of habitual residence of the person directly suffering damage." Hague Convention on the Law Applicable to Prods. Liability, Art. 4, <u>available at</u> http://www.hcch.net/upload/ conventions/txt22en.pdf. Thus, U.S. law could possibly govern the claims of only those few plaintiffs representing eight of the 100 victims. Even if proving and applying U.S. law were as difficult as Plaintiffs contend, this would not alter the Court's analysis. That the Spanish courts might face difficulty in applying U.S. law to a small percentage of claims does not overcome the fact that this Court, and the courts in the Northern District of Illinois and Middle District of Florida, would likely face difficulty in applying foreign

---

of business in California, Boeing has it principal place of business in Illinois, and no defendant is incorporated in any of those states. (<u>See id.</u> ¶¶ 6–11.) The contacts with the foreign states are thus quite limited and would not likely lead to application of the forum states' laws.

law to all claims.  For these reasons, the Court concludes that the "familiarity with governing law" factor favors dismissal.

### 3.  Burden on Local Courts and Juries, Congestion in the Court, and Costs of Resolving a Dispute Unrelated to a Particular Forum

Plaintiffs do not, and could not, dispute that resolution of these cases will require significant time and resources.  Where the local interest in a controversy is weak as compared to the alternative forum's interest, courts have held that the burden on local courts and juries, and the related costs, are not justified.  See Piper Aircraft, 454 U.S. at 261 ("The American interest in this accident is simply not sufficient to justify the enormous commitment of judicial time and resources that would inevitably be required if the case were to be tried here."); Lueck, 236 F.3d at 1147 (holding that, "[b]ecause the local interest in this lawsuit is comparatively low, the citizens of Arizona should not be forced to bear the burden of this dispute"); In re Air Crash Over Taiwan Straits on May 25, 2002, 331 F. Supp. 2d at 1206 (holding that "it is clear that, given Taiwan's significant connection to the actions, and California's minimal one, requiring California citizens to serve as jurors in these cases would be an unfair burden"); Nai-Chao, 555 F. Supp. at 19 (noting that the court's docket was "heavily congested, and that the Court can ill afford the time and expense of adjudicating a controversy which does not have significant connections to this forum, particularly where, as here, the case will require a massive expenditure of judicial resources").  Because, as discussed above, Spain's interest in this controversy dwarfs the local interest, the burden—in terms of time and money—that this case would impose on local courts and juries counsels in favor of dismissal.

In addition, court congestion considered alone weighs in favor of dismissal.  In this district, the median time in 2009 for civil cases from filing to trial was 19.8 months. U.S. Courts, Caseload Statistics 2009: Table C-5, U.S. District Courts—Median Time Intervals From Filing to Disposition of Civil Cases, available at

http://www.uscourts.gov/Viewer.aspx?doc=/uscourts/Statistics/FederalJudicialCaseloadStatistics [hereinafter "Caseload Statistics 2009"].  The Northern District of Illinois and Middle District of Florida face similar median times of 25.5 months and 22.6 months, respectively.  Id.  The Court does not have comparable statistics for Spanish courts,[9] but it is beyond dispute that this Court faces significant congestion.[10]  Hearing these cases would contribute to the congestion in the U.S. courts.  Thus, as in Van Schijndel, "[i]n addition to imposing a burden on the community whose tax dollars would have to support the expense of trying this case and whose time would be taken up by sitting as jurors, . . . Plaintiffs' suit would also impede the ability of local litigants to try their cases in this district."  Van Schijndel, 434 F. Supp. 2d at 782.

For these reasons, the Court concludes that the burden on local courts and juries, court congestion, and costs of resolution factors all weigh in favor of dismissal.

### 4.  Summary of Public Interest Factors

For the reasons discussed above, the Court concludes that (1) the relatively small local interest in this suit strongly favors dismissal, (2) that the likelihood that this Court would have to apply Spanish law favors dismissal, and (3) that, because this Court has a relatively small interest in this controversy, the burden on local courts and juries, court congestion, and costs of resolving this dispute all weigh in favor of dismissal.  The public interest factors thus strongly favor dismissal.  These factors "make trial in [this] forum inappropriate because of considerations affecting the court's own administrative

---

[9] Defendants cite a report by Spain's General Council of the Judiciary indicating that the average length of proceedings in the courts of Catalonia, where the Barcelona court that Plaintiffs would bring their claims sits, is 7.1 months.  (Salvador Decl., Ex. 1 [General Council of the Judiciary, The Spanish Justice System: All the Facts 2009] at 81.)  This statistic, however, is not comparable to the U.S. statistic measuring the time from filing to trial.  Indeed, in this district the median time between filing and disposition (of whatever sort) is only 6.7 months.  Caseload Statistics 2009, supra.

[10]The problem of congestion is exacerbated by the continuing failure of the political branches to fill existing judicial vacancies that have remained open for more than a year.

and legal problems." <u>See</u> <u>Koster</u>, 330 U.S. at 524.  The suits are therefore **DISMISSED** on <u>forum non conveniens</u> grounds.

## IV.

## CONCLUSION

For the reasons set forth above, the Court concludes that Spain is an available and adequate alternative forum, that the private interest factors favor dismissal, and that the public interest factors strongly favor dismissal.  Especially in light of the fact that the foreign plaintiffs' choice of a U.S. forum deserves diminished deference, the Court concludes that the factors warrant dismissal on <u>forum non conveniens</u> grounds here.  The Defendants' motion to dismiss is therefore **GRANTED**.

**IT IS SO ORDERED.**

DATED: March 22, 2011

_____
Gary Allen Feess
United States District Judge

33